## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA

### CHARLESTON DIVISION

UNITED STATES OF AMERICA,

                Plaintiff,

v.                                  CRIMINAL ACTION NO. 2:15-cr-00217

DAVID JUSTIN KERNS, and,
KATIE MARIE KERNS,

                Defendants.


### MEMORANDUM OPINION AND ORDER


Pending before the Court is Defendants' Revised Joint Motion to Suppress Evidence. (ECF No. 65.)[1]  For the reasons discussed herein, the motion is **DENIED**.

### I.    Background

Defendants David and Katie Kerns are named in a single-count indictment charging them with aiding and abetting each other in the possession of heroin with intent to distribute in violation of 21 U.S.C. § 841(a)(1) and 18 U.S.C. § 2.  (ECF No. 1.)  The instant revised suppression motion was filed on August 15, 2016, and the Court conducted an evidentiary hearing on the motion on September 2, 2016.  The following facts were derived from the testimony and exhibits adduced during that hearing.[2]

---

[1] The revised motion indicates that it is intended to replace the Defendants' prior joint motion to suppress, originally filed on July 1, 2016.  Accordingly, the original joint motion to suppress, (ECF No. 41), is **DENIED AS MOOT**.

[2] These facts are based on a rough draft of the evidentiary transcript, and accordingly include no direct citations.  The parties are encouraged to request an official transcript from the court reporter should they desire to review any

Corporal Christopher Blevins is a member of the Bureau of Criminal Investigations Drug Unit of the West Virginia State Police.[3]   For approximately the last seven years, he has been involved in investigating drug activity in the Parkersburg, West Virginia area.   On February 16, 2015, he and another West Virginia State Police ("WVSP") trooper conducted a "debrief" interview with a confidential informant ("CI") following the CI's arrest on charges of possessing marijuana.   During this interview, the CI stated that Defendants, David and Katie Kerns[4], were planning to pick up a large shipment of heroin from somewhere in Ohio, possibly Cincinnati.   In particular, the CI indicated that the shipment would include approximately ten ounces of heroin and that he expected it to be brought into the Parkersburg area within the next few days.   The CI came to know this information through his on again, off again intimate relationship with Defendant Katie Kerns.   He further stated that he had used heroin with Katie Kerns before, and that David Kerns was known to deal large amounts of heroin from his residence in Parkersburg.[5]   Officers

---

testimony from that hearing.

[3] On September 9, 2016, the Court received a letter from the United States Attorney's Office, disclosing a recently discovered issue regarding Corporal Blevins' credibility.   In particular, the letter attached a 2007 Report and Recommendation in which United States Magistrate Judge John S. Kraull, in the North District of West Virginia, found that Corporal Blevins had filed an application and affidavit for search warrant that contained material misrepresentations and omissions.   *See United States v. Christine White*, No. 2:07CR4 (N.D. W. Va. May 7, 2007). The Government's letter indicates that Magistrate Judge Kraull's order was not discovered until after the suppression hearing was conducted on September 2, 2016.   Defense counsel represents that they would have questioned Corporal Blevins about the incident at the suppression hearing had they been made aware of it beforehand.   (ECF No. 90.) Defense counsel does not, however, seek to reopen the suppression hearing or question Corporal Blevins directly. Rather, they simply request that this Court take notice of Magistrate Judge Kraull's order and consider it as part of its "assessment of Cpl. Blevins [sic] overall credibility as a witness."   (*Id.* at 1.)

The Court has considered the fact that Corporal Blevins was previously found to have included material misrepresentations and omissions in a search warrant application, but ultimately determines that this fact has limited relevance to its disposition of the current matter.   Corporal Blevins provided testimony regarding the West Virginia State Police's background investigation into the Defendants in this case.   Defendants, however, have never challenged his description of that investigation or otherwise placed Corporal Blevins' credibility into dispute.   Simply put, absent some assertion by Defendants that the facts were not as Corporal Blevins described them, resolution of the pending suppression motion does not turn on the officer's credibility.   Accordingly, Magistrate Judge Kraull's findings regarding Corporal Blevins do not ultimately alter the Court's analysis of the pending motion, which assesses the objective existence of probable cause to search based on largely undisputed facts.

[4] Although Defendants share a last name, they are apparently related neither by blood nor marriage.

[5] The CI also indicated that he personally sold heroin, and WVSP officers conducted controlled heroin purchases from

were able to determine that David Kerns resided at 507 Postelwaite Street in Parkersburg based on the CI's detailed description of that residence.

According to the CI, Defendants would be travelling to Ohio to pick up the heroin shipment in David Kerns' vehicle, which the CI described as a purple or maroon Jeep Grand Cherokee. Corporal Blevins testified that he was already familiar with David Kerns' name, based on his conversations with other local officers, as a possible heroin dealer in the Parkersburg area. Additionally, Corporal Blevins was aware that David Kerns' brother, Steven Kerns, was a high priority target for local investigators, suspected of trafficking large amounts of heroin in the area, although he did not have any specific information connecting David Kerns to that activity.   Based on all of this information, officers began surveillance of David Kerns' residence, where they observed a maroon Jeep Grand Cherokee matching the CI's description.   Surveillance began on February 18, 2015, two days after the debriefing interview.   On that day, Corporal Blevins and his team conducted 13 to 14 hours of uneventful surveillance.   During this time period, however, Corporal Blevins testified that he remained in contact with the CI.   Through these communications, the CI indicated that Defendants were planning on going to Ohio to pick up the heroin the following day, February 19, 2015, although the CI was not certain of the exact timing of the trip.

On February 19, 2015, officers observed David Kerns get in the maroon Jeep Grand Cherokee and pick up Katie Kerns from the CI's residence, where she had spent the previous night. After a stopover at David Kerns' residence, the Jeep Grand Cherokee proceeded to cross over into Ohio, via the Dupont Bridge on U.S. Route 50, at approximately 12:30 p.m.   The government

---

him prior to the debriefing interview.

contends, and Defendants do not dispute, that "the most direct route to Cincinnati, Ohio from Parkersburg, West Virginia requires crossing the U.S. Route 50 'Dupont Bridge.'"   (ECF No. 71 at 3.)   Corporal Blevins subsequently contacted a team of officers, including the WVSP officers who had assisted with the original surveillance, local Parkersburg uniformed officers, and Trooper Kevin Williams, a canine handler with the WVSP.   Corporal Blevins testified that he informed each of these officers of the nature of the ongoing narcotics investigation and set up surveillance operations at the Dupont Bridge with the aim of intercepting Defendants upon their anticipated return to West Virginia.

Throughout the day of February 19, Katie Kerns kept in contact with the CI, advising him of the timing of their return travel plans.   The CI then relayed this information to Corporal Blevins, generally informing the officer of when Defendants could be expected to return.   Based on that information, and estimates about how long it would take to complete a round trip from Parkersburg to Cincinnati, Corporal Blevins and his team set up surveillance on the Dupont Bridge at 7:00 p.m. At about 9:20 that night, the maroon Jeep Grand Cherokee returned, and Corporal Blevins, who was stationed on the Ohio side of the Dupont Bridge, advised the other officers that he had identified the vehicle.   Following this alert, he and the uniformed officers began following Defendants' vehicle.   Trooper Williams made the actual traffic stop because he was driving a marked cruiser, while Corporal Blevins, who was driving an undercover vehicle, stationed himself in a parking lot across the street from the traffic stop for observation.

As noted above, Trooper Williams is a canine handler based in the Charleston area, who was called by Corporal Blevins to assist with the Kerns investigation in Parkersburg on February 18th and 19th, 2015.   On the 19th, he arrived in Parkersburg about the time the local officials had

4

begun to set up surveillance at the Dupont Bridge and was given a description of the vehicle and individuals he would be stopping.   Additionally, he was told that, based on information provided by a CI, the WVSP suspected that Defendants were traveling to Cincinnati, Ohio, a source city and state for narcotics trafficking into the Parkersburg area, where they would pick up a large amount of heroin to bring back to Parkersburg.   Finally, Corporal Blevins told Trooper Williams that the purpose for initiating the traffic stop was to ascertain whether Defendants had obtained quantities of heroin in Ohio for transmission into the Parkersburg area.   Despite this primary motivation, Trooper Williams also noted that Defendants' license plate was obstructed (in particular, the registration sticker), and informed Defendants that the primary purpose of the traffic stop was to investigate this registration violation.   According to Trooper Williams, he did this to make Defendants feel at ease about the nature of the stop and to protect the integrity of the ongoing narcotics investigation.

Upon approaching the vehicle, Trooper Williams verified Defendants' identity by requesting and inspecting their respective drivers' licenses.   An on-the-scene records check revealed an outstanding Ohio arrest warrant for Katie Kerns for possession of heroin.   Based on this warrant, Katie Kerns was taken into custody and placed in another trooper's vehicle.   Trooper Williams also ordered David Kerns, who was driving, to exit the vehicle and performed a protective frisk for weapons.   While that search did not reveal any weapons, it did uncover a container of hydrocodone pills, for which David Kerns admitted he did not have a valid prescription.   Following these developments, Trooper Williams asked David Kerns for consent to search the vehicle.   Mr. Kerns refused.   Trooper Williams then proceeded to deploy his canine,

Feera, around the exterior of the vehicle to sniff for imprinted odors.[6]   Trooper Williams testified

that Feera alerted for the presence of controlled substances at the door on the driver's side of the

vehicle.   According to Trooper Williams, the WVSP train their drug dogs to alert using a two-

step process.   The first step is a change in behavior, marked here by a whip of the head, heavier

breathing, and harder sniffing.   The second is the actual passive alert, pursuant to which the canine

actually sits down to indicate the presence of imprinted odors.   Trooper Williams testified that

Feera demonstrated both steps on the night in question.

Following the positive alert, David Kerns denied that there were any controlled substances

in the vehicle, and Trooper Williams proceeded to search the vehicle, with assistance from his

fellow uniformed officers.   That search uncovered three Valvoline grease tubes on the driver's

side of the backseat of the vehicle, containing sizeable amounts of a substance identified as black

tar heroin.   Both Defendants were arrested and taken into custody.   At the police station, after

being advised of her Miranda rights and signing a written waiver of those rights, (ECF No. 83, Ex.

1), Katie Kerns gave an incriminating statement in which she stated that she travelled to Cincinnati

with David Kerns to pick up a large quantity of heroin.   Subsequently, Corporal Blevins visited

David Kerns' residence, where he encountered Mr. Kerns' girlfriend, Christine Kirby.   Ms. Kirby

signed a written consent to search form, (ECF No. 83, Ex. 2), and Corporal Blevins conducted a

search of the residence which uncovered numerous narcotic pills, suspected marijuana, tools of the

drug distribution trade including baggies and scales, a sawed-off shotgun, and a business ledger.

Defendants' filed their revised joint suppression motion on August 15, 2016, seeking to

suppress all of the above-described evidence, including the heroin found in the Jeep, the pills found

---

[6] Feera is trained to detect the odor of several controlled substances, including methamphetamine, marijuana, heroin, cocaine, and cocaine base.

on the person of David Kerns, the evidence recovered from the later search of David Kerns' residence, and Katie Kerns' post-arrest incriminating statements.[7]   Defendants argue that the original traffic stop was not justified, as the evidence demonstrates that David Kerns' vehicle was not actually in violation of any law regulating the visibility of registration plates.   Further, they argue that the subsequent pat-down of David Kerns' person was not a valid *Terry* frisk, that the fruits of that search were illegally obtained, and that no probable cause to search the car was developed before the canine was deployed.   To the extent probable cause to search is based on the Feera's positive alert, they challenge the reliability of that alert, based both on its accuracy at the scene of the crime and the adequacy of Feera's training and certification.   Finally, given that the stop and search of the vehicle were both invalid, they argue that Katie Kerns' subsequent statement and the evidence seized from David Kerns' residence trace directly to unconstitutional action and should be suppressed as fruits of the poisonous tree.   The Government responds primarily by contending that the officers' actions, both in stopping Defendants' vehicle and subsequently searching it, were justified on the basis of the CI's drug trafficking information, as corroborated by police investigation.   Thus, whether or not the pretextual traffic stop or subsequent canine sniff were valid, the officers had probable cause to believe contraband was in the vehicle at the time of the stop and thus committed no Fourth Amendment violation justifying exclusion.

## II.      Legal Standard

---

[7] Katie Kerns gave two statements to police.   The first was at the scene of the traffic stop and there is no dispute that it was taken after her arrest and without proper *Miranda* warnings.   Accordingly, the United States represents that it does not intend to introduce this statement at trial.   (ECF No. 71 at 24.)   To the extent Defendants' argument relates to this statement then, it has been mooted.   To the extent it relates to the later statement made at police headquarters, it is premised on the fruit of the poisonous tree doctrine, and the legality thus depends on the legality of the original detention and search of the vehicle in which Katie Kerns was travelling.

"As a general rule, the burden of proof is on the defendant who seeks to suppress the evidence." *United States v. Adkinson*, ---F. Supp. 3d---, 2016 WL 3248357, at *2 (E.D. Va. June 9, 2016) (citing *United States v. Dickerson*, 655 F.2d 559, 561 (4th Cir. 1981)).   However, given the well-established principle that a search conducted without a warrant is "per se unreasonable under the Fourth Amendment," *Katz v. United States*, 389 U.S. 347, 357 (1967), the United States bears the burden at a suppression hearing of proving by a preponderance of the evidence that a warrantless search or seizure did not violate the Fourth Amendment.   *See United States v. Matlock*, 415 U.S. 164, 177 n. 14 (1974) (noting that "the controlling burden of proof at suppression hearings should impose no greater burden than proof by a preponderance of the evidence"); *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977) ("[I]f a defendant produces evidence that he was arrested or subjected to a search without a warrant, the burden shifts to the government to justify the warrantless arrest or search."); *United States v. Hunter*, 63 F. Supp. 3d 614, 619 (E.D. Va. 2014) ("Once the defendant establishes a basis for his motion to suppress, the burden shifts to the government to prove the admissibility of the challenged evidence by a preponderance of the evidence.").

## III.   Discussion

Although Defendants raise a number of constitutional challenges and seek to suppress several different types of evidence, the general thrust of their argument is that they were unlawfully searched and seized on the night of February 19, 2015, in contravention of their Fourth Amendment rights.   "The basic purpose of [the Fourth] Amendment . . . is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *Camara v. Mun. Ct. of San Francisco*, 387 U.S. 523, 528 (1967).   "The Fourth Amendment does not prohibit all

searches [and seizures], only those that are unreasonable." *United States v. Davis*, 690 F.3d 226, 241 (4th Cir. 2012). "Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place." *New Jersey v. T.L.O.*, 469 U.S. 325, 337 (1985).

Here, Defendants' motion requires the Court to analyze the reasonableness of three police actions: (1) the initial stop of the vehicle, (2) the search of David Kerns' person, and (3) the subsequent warrantless search of the automobile.

### A.     Lawfulness of Traffic Stop

"The '[t]emporary detention of individuals during the stop of an automobile by police, even if only for a brief period and for a limited purpose, constitutes a seizure of persons with the meaning of [the Fourth Amendment].'" *United States v. Guijon-Ortiz*, 660 F.3d 757, 764 (4th Cir. 2011) (alterations in original) (quoting *Whren v. United States*, 517 U.S. 806, 809–10 (1996)). Thus, it is well-established that a traffic stop is subject to Fourth Amendment analysis. "Because a traffic stop is more analogous to an investigative detention than a custodial arrest, [the Fourth Circuit] treat[s] a traffic stop, whether based on probable cause or reasonable suspicion, under the standard set forth in *Terry v. Ohio*, 392 U.S. 1 (1968)." *United States v. Digiovanni*, 650 F.3d 498, 506 (4th Cir. 2011). Under that standard, the case law is clear that the observation of a traffic violation "provides sufficient justification for a police officer to detain the offending vehicle for as long as it takes to perform the traditional incidents of a routine traffic stop." *United States v. Branch*, 537 F.3d 328, 335 (4th Cir. 2008).

However, while a police officer is free to conduct a traffic stop where a traffic violation exists, including as a pretext where his true motivations are the investigation of unrelated criminal

activity, *see Whren*, 517 U.S. at 810–13, he is also justified in conducting "a brief investigatory stop" any time he "has reasonable suspicion that criminal activity may be afoot." *United States v. Perkins*, 363 F.3d 317, 321 (4th Cir. 2004). Thus, *Terry* stops of vehicles can be based on reasonable suspicion of any kind of ongoing criminal activity and need not be related to any traffic violation. *See United States v. Arvizu*, 534 U.S. 266, 277 (2002) (upholding investigative stop of vehicle where officer had reasonable suspicion to believe it was engaged in illegal smuggling activity); *United States v. Singh*, 363 F.3d 347, 355 (4th Cir. 2004) ("[I]t is elementary that the authorities are entitled to stop a moving vehicle reasonably suspected of involvement in smuggling contraband, and they may briefly detain and investigate such a vehicle and its occupants.").

In this case, as will be discussed below, the officers who stopped Defendants had *probable cause* to believe that drug-related criminal activity was afoot even before they conducted the traffic stop. As the above case law makes clear, however, all they needed was reasonable suspicion. "'Reasonable suspicion' is demonstrated when an officer 'point[s] to specific and articulable facts which, taken together with rational inferences from those facts, evince more than an inchoate and unparticularized suspicion or hunch of criminal activity.'" *United States v. Mason*, 628 F.3d 123, 128 (4th Cir. 2010) (alteration in original) (quoting *Branch*, 537 F.3d at 336)). The existence of reasonable suspicion is to be determined on the totality of the circumstances, and "factors which by themselves suggest only innocent conduct may amount to reasonable suspicion when taken together." *Perkins*, 363 F.3d at 321. Reasonable suspicion is a "less demanding standard" than probable cause in that it can be established not only "with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable

10

suspicion can arise from information that is less reliable than that required to show probable cause." *Alabama v. White*, 496 U.S. 325, 330 (1990).

Here, the officers certainly had such reasonable suspicion. As detailed above, they were acting on information from a known CI that Defendants would soon be travelling to Ohio to purchase a specific quantity of heroin (about ten ounces) in David Kerns' maroon Jeep Grand Cherokee. The CI volunteered these details in an in-person debriefing session with law enforcement officials pursuant to which he had described his own criminal activity in addition to the criminal activity of others. Even more importantly, his tip was based on first-hand and sometimes real-time communication with Katie Kerns, as the CI spent the night immediately preceding the trip to Ohio with Ms. Kerns and continued to communicate with her during the course of that trip. Finally, the tip set forth predictive behavior that WVSP officials were able to corroborate through their surveillance efforts, observing the Defendants meeting up in the previously-described maroon Jeep Grand Cherokee at the general time predicted by the CI, leaving from the residence that the CI had described, and travelling into Ohio in the general direction of Cincinnati. When the vehicle returned approximately nine hours later, in line with the time it would take to travel to Cincinnati from Parkersburg and back and as confirmed by the CI's continuing communications with Ms. Kerns, the officers determined to conduct an investigative stop of Defendants' vehicle.[8]

---

[8] The bulk of the investigation was conducted by Corporal Blevins, who communicated with the CI, initiated surveillance of David Kerns' residence and later the Dupont Bridge, and arranged for Trooper Williams to come to Parkersburg to assist with a traffic stop, but did not actually effectuate that traffic stop. The record shows, however, that Corporal Blevins briefed all of the officers working surveillance at the Dupont Bridge, including Trooper Williams, on the nature of the investigation. Trooper Williams confirmed that Corporal Blevins called him to request his assistance with a traffic stop and that his presence in a marked police vehicle was necessary to conduct such a stop. He further stated that Corporal Blevins advised him of the ongoing investigation, including Corporal Blevins' communications with the informant and the nature of Defendants' suspected illegal activity.

Defendants do not challenge Trooper Williams' knowledge of the facts and circumstances justifying the stop

11

Given the CI's close personal connection with Katie Kerns and his description of specific predictive behavior, his tip served to "eliminate a substantial portion of innocent travelers," *United States v. McCoy*, 513 F.3d 405, 413 (4th Cir. 2008), "demonstrate a connection to criminal activity," *United States v. Palmer*, 820 F.3d 640, 650 (4th Cir. 2016), and provide the officers in this case with much more than a hunch to believe that Defendants were engaged in illegal activity. Accordingly, the officers' seizure of Defendants' vehicle was justified at its inception and reasonable under the Fourth Amendment. Nonetheless, Defendants attempt to argue that the seizure was not reasonable because Trooper Williams stated he was making the stop based on David Kerns' violation of the West Virginia statute regulating obstructed license plates. Because the facts show that David Kerns was not actually in violation of that statute, they argue the stop was not justified and to the extent that it was, it exceeded the scope of an ordinary traffic stop. This argument ignores Trooper Williams' direct testimony that the purpose of the traffic stop was to investigate Defendants' suspected drug trafficking activity, and that he only told Defendants it was a minor traffic infraction to put them at ease and to protect the ongoing drug investigation. As described herein, Trooper Williams had probable cause to believe that such drug activity was taking place and was thus justified in making a stop for that purpose.

---

and search of their vehicle. Given the level of control Corporal Blevins exerted over the investigation and his communications with Trooper Williams prior to the traffic stop, the Court finds that Corporal Blevins' knowledge of the facts and circumstances surrounding Defendants' suspected illicit activity is appropriately attributed to Trooper Williams. *See United States v. Massenburg*, 654 F.3d 480, 492 (4th Cir. 2011) (noting that under collective knowledge doctrine, "when an officer acts on an instruction from another officer, the act is justified if the instructing officer had sufficient information to justify taking such action herself"); *United States v. Pitt*, 382 F.3d 322, 324–25 (4th Cir. 1967) (finding that where one officer received a tip from a CI sufficient to establish probable cause to arrest and communicated the substance of his conversation with the CI to a second officer, the second officer was justified in making an arrest based on the knowledge of the original officer); *United States v. Laughman*, 618 F.2d 1067, 1072 n.3 (4th Cir. 1980) (noting that when "a group of agents in close communication with one another determines that it is proper to arrest an individual, the knowledge of the group that made the decision may be considered in determining probable cause, not just the knowledge of the individual officer who physically affected the arrest").

Moreover, because the basis for the stop was not an ordinary traffic stop, Defendants' argument that Trooper Williams "unnecessarily expand[ed] the scope of the traffic stop," (ECF No. 66 at 3), lacks merit.   Of course, "[t]he scope of [a] search must be 'strictly tied to and justified by' the circumstances which rendered its initiation permissible."   *Terry*, 392 U.S. at 19 (quoting *Warden v. Hayden*, 387 U.S. 294, 310 (1967) (Fortas, J., concurring)).   Where, as here, the primary justification for that stop is illicit drug activity rather than a minor traffic infraction, however, officers can directly investigate that activity and are not limited to simply "requesting a driver's license and vehicle registration, running a computer check, and issuing a ticket." *Digiovanni*, 650 F.3d at 507.

## B.      Search of David Kerns' Person

Defendants' next contention is that, even assuming the original traffic stop was justified, Trooper Williams lacked the requisite level of suspicion to conduct a pat-down search of David Kerns.   As such, they seek to suppress the hydrocodone pills that were seized from his person as a result of that search.   The above discussion outlining Trooper Williams' (at least) reasonable suspicion to believe Defendants' were engaged in transporting illegal drugs, however, necessitates a finding that the pat-down was reasonable.

It is well-established that "a police officer, 'as a matter of course,' may order the *driver* of a lawfully stopped car out of his vehicle."   *United States v. Sakyi*, 160 F.3d 164, 167 (4th Cir. 1998) (quoting *Pennsylvania v. Mimms*, 434 U.S. 106, 110 (1977)).   Once the driver is ordered out of his car, officers may "perform a patdown of a driver and any passengers upon reasonable suspicion that they may be armed and dangerous."   *Arizona v. Johnson*, 555 U.S. 323, 332 (2009) (quoting *Knowles v. Iowa*, 525 U.S. 113, 117–18 (1998)).   In *Sakyi*, the Fourth Circuit took note

13

of the fact that "guns often accompany drugs," and held that "in connection with a lawful traffic stop of an automobile, when the officer has reasonable suspicion that illegal drugs are in the vehicle, the officer may, in the absence of factors allaying his safety concerns, order the occupants out of the vehicle and pat them down briefly for weapons to ensure the officer's safety and the safety of others."  *Sakyi*, 160 F.3d at 169.

Here, Trooper Williams' *Terry* frisk of David Kerns revealed a silver container that Mr. Kerns voluntarily admitted contained hydrocodone pills for which he did not have a valid prescription.   Defendants do not contend that seizure of the hydrocodone pills exceeded the scope of a valid *Terry* frisk, only that the frisk was not justified at its inception.   As the circumstances provided Trooper Williams at least reasonable suspicion that illegal drugs were present in the car during the stop, he was justified in conducting a pat-down search for weapons.   When that lawful search then revealed a container that David Kerns admitted contained hydrocodone pills, the officer was justified in seizing that contraband.   Accordingly, the Court finds that the search of David Kerns' person was a reasonable precautionary measure in light of the suspected presence of illegal drugs and the Court will not suppress the fruits of that search.

### C.    Warrantless Search of the Vehicle

From the foregoing, then, it is clear that the officers lawfully stopped Defendants' vehicle, performed a pat down search of David Kerns' person that revealed the presence of illegal controlled substances, and performed a records check on Katie Kerns that revealed an outstanding warrant for heroin possession in Ohio.   On the basis of this information, plus the positive alert of the drug dog Feera, the officers proceeded to perform a warrantless search of Defendants' vehicle that resulted in the seizure of 271.86 grams of heroin from the inside of three Valvoline grease

14

tubes.  (ECF No. 65 at 4.)  Defendants vigorously challenge the reliability of the dog sniff at issue in this case, and solicited an expert witness in canine drug detection to provide testimony on the subject at the evidentiary hearing.  Even without taking Feera's positive alert into account, however, the Court determines that the vehicle search was justified based on the existence of probable cause, under the totality of the circumstances, to believe that the vehicle contained illegal drugs.  As indicated above, the officers had probable cause to search for narcotics based purely on the information provided by the CI.  The subsequent discovery of unlawful narcotics and an outstanding warrant for heroin activity in Ohio only added to that probable cause and gave the officers an even stronger basis to search.

The Supreme Court has long read the text of the Fourth Amendment to impose a warrant requirement as the baseline for determining the reasonableness of government searches.  *See City of Los Angeles v. Patel*, 135 S. Ct. 2443, 2452 (2015) (noting that "the Court has repeatedly held that searches conducted outside the judicial process, without prior approval by [a] judge or [a] magistrate [judge], are *per se* unreasonable . . . subject only to a few specifically established and well-delineated exceptions" (alterations and omission in original) (citations omitted)).  There exists, however, a well-established exception for automobile searches, pursuant to which "[p]olice officers do not need a warrant to search an automobile if they have probable cause to believe it contains evidence of criminal activity."  *United States v. Patiutka*, 804 F.3d 684, 690 (4th Cir. 2015).  So long as such probable cause attaches to a vehicle that is readily mobile, officers may conduct a search of the vehicle that is "as broad as a magistrate could authorize."  *United States v. Kelly*, 592 F.3d 586, 589 (4th Cir. 2010).  Accordingly, "once police have probable cause, they may search 'every part of the vehicle and its contents that may conceal the object of the search.'"

*Id*. at 590 (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)).   The automobile exception has two justifications: (1) the automobile's inherent mobility, and (2) the reduced expectation of privacy that attaches to an automobile.   *Id*. ("Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that relating to one's home or office." (quoting *South Dakota v. Opperman*, 428 U.S. 364, 367 (1976))).

Probable cause for contraband justifies the warrantless search whether or not exigent circumstances exist to prevent officers from actually obtaining a warrant; the automobile exception "does not have a separate exigency requirement."   *Maryland v. Dyson*, 527 U.S. 465, 467 (1999). "Probable cause exists when 'the known facts and circumstances are sufficient to warrant a man of reasonable prudence in the belief that contraband or evidence of a crime will be found.'" *Patiutka*, 804 F.3d at 690 (quoting *Ornelas v. United States*, 517 U.S. 690, 696 (1996)).   As with any Fourth Amendment inquiry, the existence of probable cause to search is an objective inquiry, and a court must "examine the facts 'from the standpoint of an objectively reasonable police officer, giving 'due weight to inferences drawn from those facts by . . . local law enforcement officers.'"   *Kelly*, 592 F.3d at 592 (omission in original) (quoting *Ornelas*, 517 U.S. at 696, 699); *see also Whren*, 517 U.S. 806, 813 (noting that an officer's subjective intent does not make otherwise lawful conduct illegal, and that "the fact that the officer does not have the state of mind which is hypothecated by the reasons which provide the legal justification for the officer's action does not invalidate the action taken as long as the circumstances, viewed objectively, justify that action" (quoting *Scott v. United States*, 436 U.S. 128, 138 (1978))); *Ross*, 456 U.S. at 808

16

(requiring that the probable cause determination in the context of a warrantless automobile search "be based on objective facts that could justify the issuance of a warrant by a magistrate").

"[P]robable cause is a fluid concept—turning on the assessment of probabilities in particular factual contexts—not readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 232 (1983).   Determinations are to be based on the totality of the circumstances, and the Supreme Court has consistently "rejected rigid rules, bright-line tests, and mechanistic inquiries in favor of a more flexible, all-things-considered approach." *Florida v. Harris*, 133 S. Ct. 1050, 1055 (2013).   "Probable cause requires an officer to have a '*reasonable ground* for belief of guilt,'" a standard that is "less demanding than a standard requiring a preponderance of the evidence for the belief."   *United States v. Ortiz*, 669 F.3d 439, 446 (4th Cir. 2012) (quoting *Brinegar v. United States*, 338 U.S. 160, 175 (1949)); *see also Gates*, 462 U.S. at 235 ("Finely-tuned standards such as proof beyond a reasonable doubt or by a preponderance of the evidence . . . have no place in the [probable-cause] decision.").

Thus, while certain factors such as a trained drug dog's alert on a vehicle or an officer's detection of a marijuana odor have been deemed sufficient to establish probable cause to search, *see United States v. Palmer*, 820 F.3d 640, 650 (2016), the presence of such factors is not necessary to a determination that probable cause exists to conduct a warrantless search pursuant to the automobile exception.   *See Ortiz*, 669 F.3d at 447 (upholding district court's determination that officers had information sufficient to make it more likely than not that drugs were located in a vehicle, and thus justifying a warrantless search, without any evidence that a drug dog had given a positive alert); *United States v. Brookins*, 345 F.3d 231, 236 (4th Cir. 2003) (finding that district court erred in not finding probable cause to search automobile where the defendant had previously

17

been convicted of drug offenses, a reliable informant stated the defendant frequently made deliveries in the area where his car was discovered, and officers recovered a package containing crack cocaine that had been discarded from the car).   "[T]he scope of a warrantless search of an automobile is 'no narrower—and no broader—than the scope of a search authorized by a warrant supported by probable cause.'"   *United States v. $29,000- U.S. Currency*, 745 F.2d 853, 855 (4th Cir. 1984) (quoting *Ross*, 456 at 823).

In this case, well before the drug dog was deployed for a sniff of the vehicles' exterior, Trooper Williams had probable cause to believe that the vehicle contained drugs.   As described above, the investigation into the Kerns began not with the initial stop of their automobile, but with a tip from a known informant with a close connection to Katie Kerns.   Even an anonymous tip, if sufficiently corroborated by independent police work, can support a finding of probable cause. *See Gates*, 462 U.S. at 242–46.   By the same token, "a proven, reliable informant is entitled to far more credence than an unknown, anonymous tipster," *United States v. Bynum*, 293 F.3d 192, 197 (4th Cir. 2002), and a tip from such an informant can support probable cause with comparatively less corroboration.   *See United States v. Patterson*, 406 F. App'x 773, 783 (4th Cir. 2011) (recognizing that "it is not necessary for all tips to be corroborated in order to be considered credible, and whether corroboration is necessary in a given case depends on the particular circumstances of that case" and assigning comparatively more weight to the tip of a known informant).   "Generally, when an effort is made to establish probable cause . . . based on hearsay from an informant, 'it is necessary to consider all the circumstances set forth in the affidavit, including the veracity and basis of knowledge of persons supplying hearsay information.'"

*United States v. DeQuasie*, 373 F.3d 509, 518 (4th Cir. 2004) (quoting *United States v. Hodge*, 354 F.3d 305, 309 (4th Cir. 2004)).

In this case, the CI's tip falls somewhere in between an anonymous tipster and one who has proven his credibility through the previous disclosure of reliable information.   True, this was the first time he provided information.   However, he provided the tip in person, allowing his "reputation [to be] assessed" and opening himself up to "responsib[ility] if [his] allegations turn out to be fabricated."   *Florida v. J.L.*, 529 U.S. 266, 270 (2000).   More importantly, he provided a strong basis for the information given, through his close personal connection to Katie Kerns, and set forth sufficient predictive details—such as Defendants' vehicle, destination, and general time of departure and arrival—to allow officers to corroborate the tip through independent police work. *See Gates*, 462 U.S. at 245, 246 (finding that anonymous tip provided probable cause to search where it contained details of "future actions of third parties ordinarily not easily predicted," creating a "fair probability that the writer of the anonymous letter had obtained his entire story either from the [defendants] or someone they trusted").   That much of this behavior described by the informant is innocent in nature does not discount its reliability with respect to the illegal activity that police officers could not independently corroborate.   *See United States v. Chavez*, 902 F.2d 259, 264 (4th Cir. 1990) (finding that corroboration of an informant's predictive innocent behavior created reasonable grounds to trust veracity of remaining unverified information that suspect would have contraband and thus probable cause to search); *Gates*, 462 U.S. at 243 n. 13 ("[I]nnocent behavior frequently will provide the basis for a showing of probable cause; to require otherwise would be to *sub silentio* impose a drastically more rigorous definition of probable cause than the security of our citizens demands.").

As noted above, the CI dealt primarily with Corporal Blevins rather than Trooper Williams, the officer who actually conducted the traffic stop and subsequent search of Defendants' vehicle. Nonetheless, Corporal Blevins made clear at the hearing that he briefed Trooper Williams on the nature of the ongoing investigation into heroin trafficking, the confidential source of the information against Defendants, and that Defendants were traveling to a drug source city and state. *See United States v. Foreman*, 369 F.3d 776, 784 (4th Cir. 2004) (noting that travel to a known source city, especially when the trip is long and the stay is brief, is a relevant factor in determining articulable suspicion). Thus, at the time of the traffic stop, Trooper Williams had knowledge of facts—either directly or based on knowledge shared by Corporal Blevins—that, in the totality of the circumstances, gave him probable cause to believe that the vehicle contained illegal contraband. Subsequent investigative efforts, prior to the utilization of the canine, only added to this existing probable cause. As noted above, Trooper Williams' lawful pat-down of David Kerns revealed the presence of illegal narcotics and a records inquiry revealed that Katie Kerns had an outstanding warrant for heroin possession in Ohio. This evidence of illegal drug activity (and heroin specifically) taking place in Ohio provided further corroboration of the CI's information and evidence that the vehicle itself contained more illegal controlled substances. *See United States v. Harvey*, 16 F.3d 109, 112 (6th Cir. 1994) (holding that controlled substances found on the person of an automobile driver, coupled with false information regarding ownership of the automobile and the absence of any valid driver's licenses, provided probable cause for a warrantless search of the automobile); *United States v. Grossman*, 400 F.3d 212, 218 (4th Cir. 2005) (listing a suspect's criminal history as a relevant factor in the probable cause determination).

Thus based on the tip and the corroborating evidence from both before and after the traffic stop, Trooper Williams had probable cause to believe that the vehicle contained narcotics, justifying a warrantless search pursuant to the automobile exception.   Although a positive alert by a trained canine would have provided an independent basis for such probable cause, it was by no means necessary to such a determination.   *See United States v. Alexander*, 573 F.3d 465, 476–77 (7th Cir. 2009) (in a case where a defendant challenged the reliability of a canine's positive alert, finding that probable cause to search an apartment "independent of the dog's positive alert," and that the alert "merely provided another circumstance supporting the reasonable belief that the apartment contained drugs"); *United States v. Wyatt*, 203 F. Supp. 2d 644, 650 (noting that while a drug dog's positive alert provided "independent" probable cause to search a vehicle, "the discovery of the drugs on [the defendant's] person, coupled with his criminal history and admission that an additional amount of marijuana was present in the vehicle, also provided" the officer with sufficient probable cause to conduct a warrantless search of the vehicle), *aff'd* 84 F. App'x 318 (4th Cir. 2004).   On these facts, "a reasonable officer would have a 'reasonable ground to believe' that drugs were in the vehicle," *Ortiz*, 669 F.3d at 446, based on the CI's information and the evidence corroborating it.   The additional evidence of criminal activity gleaned during the investigative stop was just icing on the cake.   Accordingly, probable cause existed to search the automobile independent of Feera's positive alert, making the reliability of her alert in this case a moot point.

### D.    Fruits of the Poisonous Tree

Defendants seek to suppress two of Katie Kerns' incriminating post-arrest statements. The first was made at the scene of the stop following her arrest on the outstanding warrant and

without any *Miranda* warnings.   As indicated above, the Government does not intend to use these statements at any trial, so any argument on this point is moot.   The second was made hours later at police headquarters.   This time, however, there is no dispute that she was given a *Miranda* warning and signed a written waiver of her *Miranda* rights.   Defendants' only argument in favor of suppression of this statement is that it was obtained as the direct result of the illegal stop and search of David Kerns' vehicle and thus "fruit of the poisonous tree."   (ECF No. 66 at 13–14.) As the Court has determined that both the stop and the search were reasonable and thus lawful under the Fourth Amendment, there is no poisonous tree in this case and thus no basis to suppress Katie Kerns' later statements.   For the same reason, there is no basis to suppress evidence recovered during a later consent search of David Kerns' residence.   That search was valid based on the signed consent of Christine Kirby, and thus admissible absent any other unconstitutional conduct or "poisonous tree."

### IV.     Conclusion

For the reasons discussed herein, the Court **DENIES** Defendants' Revised Joint Motion to Suppress Evidence.   (ECF No. 65.)

**IT IS SO ORDERED**.

The Court **DIRECTS** the Clerk to send a copy of this Order to the Defendant and counsel, the United States Attorney, the United States Probation Office, and the United States Marshal.

ENTER:        September 30, 2016

THOMAS E. JOHNSTON
UNITED STATES DISTRICT JUDGE

22